## WILLIAMS v. SHREVEPORT YELLOW CAB CO., Inc., et al.

### No. 5684.

Court of Appeal of Louisiana. Second Circuit.

June 30, 1938.

Rehearing Denied July 15, 1938.

Jack & Jack and Thos. M. Comegys, Jr., all of Shreveport, for appellants.

Jackson & Mayer, of Shreveport, and Lord, Lloyd & Bissell, of Chicago, Ill., for appellees.

DREW, Judge.

Plaintiff instituted this action in tort in her own behalf and for the use and benefit of her minor child, seeking to recover damages caused by the death of her husband and father of her child. He was shot and killed by a driver of a Yellow Cab. The driver, the Cab Company and its insurer were made defendants.

Plaintiff alleged that her husband, Clarence Williams, was shot to death by R. C. Mills, a taxicab driver employed by the defendant Cab Company, while Mills was acting within the scope of his employment. She alleged that decedent contracted with the Cab Company, through its driver, for transportation at the regular cab rates then prevailing, and that at the end of the journey Mills shot and killed her husband while in the act of collecting the fare for said transportation.

The defense made by all parties defendant is that Mills acted in self-defense. The Cab Company and its insurer make the further defense that deceased was fraudulently in said cab and never intended to pay his fare, therefore, was a trespasser and not a passenger for hire; that if he ever was a passenger for hire, that relationship had ceased when he was delivered safely at his destination and refused to pay his fare. They further contend that at the time deceased was shot and killed, the cab driver was not acting within the scope of his employment, but was acting in his own behalf and not in the interest or furtherance of his master's business.

The insurer further defends on the alleged ground that the policy of insurance does not cover the acts and resulting damage alleged to have been committed and caused by the cab driver.

The lower court rendered judgment in favor of plaintiff in her own behalf against the cab driver, Mills, in the sum of $500; and for the use and benefit of her minor child against Mills in the sum of $2,000. It rejected her demands against the Cab Company and its insurer.

Both plaintiff and Mills secured orders of devolutive appeal without bond.

Plaintiff and decedent were married on August 14, 1933. One child was born of the marriage, being on April 15, 1934. Plaintiff and deceased had not lived together for six or eight months prior to the time of deceased's death. She testified that he gave several dollars each week to her for the support of herself and child, and bought clothing for the child.

Decedent worked with a negro, named John Arthur Johnson, and for Mr. H. M. Belcher, a truck salesman of the Coca-Cola Company. He earned from $7 to $9 per week. He was paid off by Mr. Belcher on Christmas Eve, 1936, the amount he received at that time being $4.-50, all in pennies. Soon thereafter, decedent went to J. A. Johnson's home and carried with him a full quart of whiskey, which he, Johnson and the latter's wife consumed before decedent left there. We omit his movements between the time he left Johnson's house until the three met again about 7:30 P. M., the same night, at which time decedent called a taxicab. One driven by defendant Mills answered the call. The three negroes entered the cab and instructed the driver to go to a house on Maple Street where a negro woman, named Ellen McKnight, who had a date with the deceased, lived. The cab waited about thirty minutes for Ellen to get ready to go, and from this point the cab was driven through downtown Shreveport and back to Blandino's saloon and eating house, which was near the place where decedent and his friends first entered it. On the way back the cab was stopped at the saloon, under the instructions of decedent, and he and Johnson went in and purchased more whiskey, returning to the cab with a pint bottle. When the cab arrived at Blandino's saloon, the driver was informed by decedent that it was their journey's end. The cab stopped and all the occupants, except the driver, alighted. The time which it had been used was one hour and ten minutes. After decedent got out he inquired of the driver the amount of fare due and was told that it was $2.50, the regular fare for the first hour's use. Decedent remained standing at the right front door of the cab, which was open, talking with the driver for ten or fifteen minutes. Just what passed between them at that time is controversial, however, the conversation was ended when the driver shot and killed Williams. He was shot in the breast and shoulder, three shots being fired.

There are several facts which are uncontradicted. They are that the deceased, Johnson and the latter's wife were all very drunk; and the woman, Ellen, had not drunk anything. Johnson and his wife were entirely too drunk to know what happened. His wife did not know Williams had been shot until the next morning. When Johnson, his wife and Ellen had left the cab, they proceeded to the back of the saloon and Williams remained standing at the cab door. Ellen claims she returned to the front of the saloon before the shooting took place. Johnson claims he paid seventy cents to Mills, as his part of the fare, before leaving the cab. This is denied by Mills, and when we take into consideration the amount of fare due and the inability of Johnson, due to his drunkenness, to remember anything else that happened, we discard this testimony of his concerning the fare paid.

A number of negro witnesses testified they were either standing on the sidewalk and in the saloon door and saw the shooting. None of them claimed to have heard anything said by the cab driver or the decedent. They are uniform in their testimony that at the time Williams was shot, he was standing erect with his hands down by his side. None of them ever saw him with his hand in his pocket. There was one 17-year-old negro boy who claimed that he placed himself next to the cab and remained there on its left hand side and heard and saw all that was said and done. No one else saw him there. We cannot give any credence to his testimony for it is improbable to say the least.

It is an admitted fact that the decedent at the time of his death had in his possession only fifty-four cents, which was little more than one-fifth of the amount owing to the cab driver. It is also a fact that he took this money from his pocket, held it in his hand and offered it to the driver, who refused to take it. This was done only a short time before the shooting occurred. After his death, the fifty-four cents was found in his right trouser pocket. He necessarily placed his hand in his pocket to return the money there. The failure of all of plaintiff's eyewitnesses to see this movement of the decedent is unexplainable, if we accept as true their testimony that they were looking directly at him all the time he was standing at the open cab door. The fact that deceased did place his hand in his right trouser pocket corroborates the driver's version of what occurred just prior to the time he shot the decedent. Another cab driver, by the name of Huckaby, was passing in a Yellow Cab when he observed Mills' cab standing. Not knowing whether Mills was in trouble or not, he stopped and went over to the cab. He opened the left door and asked Mills if he was in trouble. A few remarks passed between them, then Huckaby closed the door and started to return to his own cab. He had only made a few steps when the shots were fired. Huckaby could not recall the words he heard pass between Mills and decedent, but stated that the latter was drunk and in a nasty mood, and that at the time he was talking to Mills, decedent had in his hand some money or pennies he was offering or had offered Mills for his fare.

Mills testified that when the cab was stopped at Ellen's house, he asked the decedent if he had sufficient money to pay the cab fare; and that he replied that he did and pulled out of his pocket and opened a pocketbook. He thought he saw a five-dollar bill in the purse. No one denied this was done, so we therefore accept it as true. Mills further testified that after decedent offered him the fifty-four cents and he had refused it, decedent then became abusive and ordered him to move on. Mills realized that deceased did not have sufficient money with which to pay the fare, so he urged him to go with him to a telephone or to get in the cab and accompany him to headquarters and explain to the manager of the Cab Company that it was not the fault of the driver in not collecting the fare. Unless this was done, the driver would be charged with the amount of fare due. Instead of agreeing to the request, decedent ordered him to get away from there, used an oath, and threatened to cut his head off if he did not move on, at the same time running his right hand into his right trouser pocket. Mills testified that, in order to protect himself, he reached in the cab drawer, got his pistol and shot decedent. Mill's testimony in this respect stands alone. No one testified who claims to have heard any of the conversation between him and the deceased.

An examination of decedent's person after he was dead revealed that he had no weapon, knife or other kind on his body. Mills never got out of the cab. He remained at all times under the steering wheel. After the shooting, he drove about three blocks and notified two policemen

that he had killed Williams. He also telephoned to his employer. A coroner's jury was impanelled soon thereafter and Mills testified before it to the same facts he testified to on the trial of the case.

We are constrained to believe Mills was justified in his act. The car door was open on decedent's side and it was closed on Mills' side. He was under the steering wheel and decedent was in close proximity to the open door. If deceased had attempted to carry out his threats, as was evidenced by his hand going to his pocket, Mills stood a wonderful chance of being badly injured. If he could have started the car instantly, he might have gotten out of the danger he thought he was in. If he had not started instantly, his danger would have been greater. Mills was not required to try to run when such action might have made the danger of injury more certain. It makes no difference that it was discovered afterwards that the decedent was unarmed. Any reasonable prudent man would have thought so under the circumstances. Especially is this true when we consider he was dealing with a drunken negro man.

We are of the opinion the judgment of the lower court awarding judgment for plaintiff against Mills is erroneous.

Our finding on the defense urged by Mills absolves the other two defendants, but since the greater portion of the argument and briefs was devoted to the defense made by the Cab Company and the insurer, we will discuss at least two of them: (1) That the decedent was not a passenger for hire at the time he was killed; and (2) that Mills was not acting within the scope of his employment at the time he fired the fatal shots.

We think both defenses are good. When deceased entered the cab he did not have enough money to pay for the anticipated trip. He no doubt knew this after he had been gone more than thirty minutes. When he stopped and bought more liquor, he had less money, all of which he was bound to have known, and it is therefore very doubtful if he was ever anything more than a trespasser in the cab. When he was at Ellen's house, he falsely told Mills that he had sufficient money to pay for the trip. From that time on he was clearly using the cab fraudulently and under false pretenses, and was a trespasser and not a passenger for hire. But, conceding he was a passenger for hire until the time the fare was demanded, when he refused to pay, no matter for what reason, he ceased at that moment to be a passenger for hire. This had happened some ten or fifteen minutes before he was killed. 10 American Jurisprudence, page 44, § 987, and cases cited under Note 13 thereof; 4 Ruling Case Law, page 1005, § 473, and cases cited under Note 8 thereof.

We quote from 45 A.L.R. 302 and 303, as follows:

"So in Fornoff v. Columbia Taxicab Company, 1913, 179 Mo.App. 620, 162 S.W. 699, an action for damages for an assault committed by a taxicab driver on one claiming to be a passenger, which was presented on appeal on the theory that a taxicab operator was a common carrier of passengers, the court observed that when the relation of carrier and passenger is established, and the passenger surrenders himself into the care and custody of the carrier, an implied obligation arises on the part of the carrier to transport the passenger, if he properly deports himself, to his destination and discharge him on arrival free from assault on the part of its servant; and that the mere stepping of the passenger from the vehicle into the street at the end of his journey will not acquit this obligation, for the passenger is to be protected from assault by the servant while he is being discharged. And it was held that this obligation of a carrier by taxicab to protect passengers from assaults by its servants continues after the passenger has stepped from the taxicab and is endeavoring to procure change with which to pay his fare in a nearby saloon, or even if he has gone from one place to another across the street on such mission, for under such circumstances the relation of carrier and passenger must necessarily continue until the passenger is finally discharged by the payment of his fare.

"But in the Fornoff Case (Mo.), supra, there was evidence that when the plaintiff alighted from the taxi, he, upon being requested to pay his fare, declared he never had and never would pay a cab fare; and that the assault was made by the driver, after repeated demands for the fare, when the plaintiff addressed rude remarks to him; the driver also testified that the plaintiff insisted that he should drive the plaintiff around without charge, and that

they would have a good time together. This evidence, the court said, tended to prove that the plaintiff did not intend to pay his fare at the time he entered the cab, or at any time thereafter, and therefore to establish that he was not a passenger at all, and not entitled to the care and protection to which a passenger would be entitled, and therefore it was held error to instruct without qualification that 'if plaintiff engaged one of defendant's taxicabs to convey him to a certain point of destination, and the defendant's chauffeur in charge of such taxicab, without sufficient cause or provocation therefor, in attempting to collect plaintiff's fare, assaulted and struck·him, then a recovery might be had against defendant on account of such assault', as it omits entirely to reckon with the testimony of the Chauffeur as to the refusal of the plaintiff to pay his fare."

When he ceased to be a passenger for hire, there was no contractual relation between him and the defendant Cab Company, and there was no liability on the part of the Cab Company for damages arising thereafter.

The second defense above set out deals with scope of employment. The master is liable for the acts of his servant, the cab driver, only when his acts are within the scope of his employment; that they are within the course of his employment is not sufficient. He must be acting in the interest of his master, as distinguished from acting in his own exclusive interest.

When the decedent told Mills he had only fifty-four cents, the idea of collecting $2.50 fare disappeared. It was impossible to collect it when the patron did not have it; that Mills had abandoned the hope of collecting it for his master is shown by the fact that he insisted that decedent accompany him to a telephone or the headquarters of the Cab Company and inform Mills' employer that it was not Mills' fault that the fare was uncollected. In doing this, Mills was not acting in the interest of his employer, but in his own personal interest. If he succeeded in having the decedent clear him of the blame for not collecting the fare, then Mills would not be charged with the fare by his employer, otherwise he would be. His actions and efforts in this respect, which were his last efforts and acts prior to killing Williams, were not acts within the scope of his employment.

A case similar in many respects is McDermott v. American Brewing Company, 105 La. 124, 29 So. 498, 52 L.R.A. 684, 83 Am.St.Rep. 225.

It therefore follows that the judgment of the lower court, insofar as it awards judgment against the defendant Mills, is reversed, and the demands of plaintiff are rejected; in all other respects, it is affirmed; costs to be paid by plaintiff.