62 So.2d 173 (1952)
BARRINGER
v.
EMPLOYER'S MUT. LIABILITY INS. CO.
No. 7889.
Court of Appeal of Louisiana, Second Circuit.
December 10, 1952.
Fink & Fink and C. Elliot Thompson, Monroe, for appellant.
Bienvenu & Culver, New Orleans, for appellee.
GLADNEY, Judge.
Invoking the provisions of the Louisiana Direct Action Statute, LSA-R.S. 22:655, the plaintiff instituted this suit to recover damages for personal injuries allegedly *174 received on January 2, 1951, while a passenger in a taxicab insured by the defendant. He received severe injuries to his face, he alleges, when the operator of said cab attacked him. From an adverse judgment he has appealed.
Appearing in the trial court defendant filed exceptions of no cause and no right of action, which exceptions were referred to the merits and not passed upon by the court a quo. These exceptions are not urged in this court and are considered as abandoned.
The defendant answered, denying that the driver of the taxicab belonging to its insured actually committed an assault and battery upon defendant and pleaded several alternative defenses, namely: (1) that if the operator of the taxicab assaulted plaintiff, then he was not at that time acting within the course and scope of his employment; (2) that the policy of insurance in effect, does not render defendant liable for the assault of the taxicab driver; and (3) a plea of contributory negligence as a bar to plaintiff's recovery.
Our brother below assigned written reasons for his judgment in which he concluded that plaintiff was assaulted by the taxicab driver but that at the time of such assault the driver was not acting within the course and scope of his employment. He also passed upon and rejected the defense urged that the policy of insurance did not, in effect, create liability for the assault by the taxicab driver.
Plaintiff alleges that on the evening aforesaid he was driven by Guy Sims, operator of the insured cab, to a number of places before reaching Louisville Avenue in the City of Monroe, Louisiana, where the cab became stalled several times and had to be pushed; that the cab left Louisville at its intersection with DeSiard Street and proceeded in a western direction back towards the business district; that Sims was driving the cab in a dangerous manner and he demanded that said employee stop the cab so he could get out; that upon the driver's refusal to do so, petitioner turned off the ignition key and got out of the cab whereupon Sims demanded that plaintiff pay him Eight ($8) Dollars, and was given a Ten ($10) Dollar bill. It was at this time, plaintiff alleges, Sims struck petitioner in the face several times with his fist, knocking him down. He further alleged that he gave Sims no cause for provocation and that as a result of the battery he suffered a fracture of the left cheek bone and bruises and discoloration of both eyes.
The allegations of the petition are somewhat inconsistent with the evidence that was adduced. The record reveals that after plaintiff and his companions, including L. C. Gerhardt and two soldiers, had spent the entire evening drinking and had become well inebriated, Sims was proceeding to drive them to a place to secure some food. At this time it was well past midnight and Sims appears to have been the only sober one in the party. During the course of the journey out Louisville Avenue the cab traveled through considerable water, which had accumulated in the street following a heavy rain. Upon finding several restaurants closed he drove to the intersection of Louisville Avenue and DeSiard Street. Sims then turned west on DeSiard Street and had proceeded some little distance thereon when, according to plaintiff's testimony, he objected to the route which Sims was taking, but as Sims paid no attention, he turned the ignition off because he wanted to leave the automobile. He explains the occurrence and subsequent events as follows:
"Q. Well, what were you going to do when you turned the switch off?
A. Get out of the car which I did.
"Q. Sir? A. Get out of the automobile.
"Q. Where were you going to go?
A. I was going home.
"Q. How were you going to go home? A. Well, that would have been my own business, don't you think?
"Q. Well, I'm asking you, Mr. Witness. A. Well, I don't have to tell you how I was going home. Isn't that good enough answer? I could have thumbed a ride. I could have walked up to somebody's house and *175 `phoned for a taxi. I mean it's a matter that I hadn't arrived at definitely in my own mind which route I was going to take to go home, nor with whom.
"Q. In other words, you just turned the * * *. A. I wanted outdefinitely outof the automobile.
"Q. Let me finish my question and then you can do all the answering you want. In other words, you wanted to turn the key on the ignition switch off, so that you could get out of the car and beyond that you had made no plans, is that correct? A. That's correct"

* * * * * *
"A. Well, coming into Monroe, this is North and I was on the side towards the ditch between the carthe car was between the road and the ditch.
"Q. And what do you say happened after you got out of the car? A. Sims struck methen for awhile I don't remember anything.
"Q. Where did he strike you? A. You mean with reference to where the car was or whereabouts on the body did he hit me, or what?
"Q. On your body. Do you know?
A. No, I do not know. I couldn't say definitely where it was.
"Q. Do you remember striking the ground? A. I remember being hit and when I came to I remember lyingI was lying on the ground.
"Q. In which position were you?
A. I was prone.
"Q. Well, were you on your face or on your back? A. On my back.
"Q. Was anybody around you? A. Gerhardt.
"Q. What was he doing? A. Trying to help me get uppick me up.
"Q. Where was Sims then? A. Sims was standing over at the end of the car. That was towards the back of the car. Evidently, I had fallen backwards.
"Q. Did Sims tell you anything before he struck you? A. Not to my knowledge, except to get in the car."
Sims gave an entirely different version of the events which occurred when Barringer had alighted. He says that he and not plaintiff turned off the ignition and stopped the cab, and he says he did this because Barringer and Gerhardt who were seated next to him on the front seat were arguing and tussling in such a manner that he could not safely drive the cab. He testified appellant got out of the car and he followed him in order to get him to return to the cab; that Barringer seemed infuriated with him for some reason, cursed him and threw a wild punch or swing which threw plaintiff off balance and caused him to fall to the pavement where his face struck the curbing. He positively asserts that at no time did he strike plaintiff nor did he have any reason to do so. Sims likewise testified that there was no controversy concerning the fare and that actually Gerhardt rather than plaintiff gave him the Ten ($10) Dollar bill referred to in the petition.
Apparently as soon as the car came to a stop the soldiers left the cab and sought some other means of transportation. They were not seen again and were not available for testifying in the case.
Gerhardt's story is rather sketchy, to say the least. He testified that after Barringer had left the cab and was about fifteen feet behind it he observed through the rear view mirror Sims striking plaintiff. He says he then got out of the cab and went back to where Barringer was lying on the pavement in a more or less unconscious condition. He says he started to help Barringer into the cab when Sims again attacked Barringer, beating him about the face. He says he saw Barringer give Sims the Ten ($10) Dollar bill after Sims had first knocked Barringer down. Upon being asked why he permitted his friend to be so assaulted without giving his assistance, his only explanation was that the assault occurred too quickly. Much of his testimony is inconsistent with that of both Barringer and Sims.
As the record is presented to us we are left in considerable doubt that plaintiff's injuries were inflicted by the taxicab driver. However, as the trial court rested its verdict *176 upon another ground which we have examined and appears to be correct, we pass on to an examination of this issue, namely, whether or not the assault, if it was actually committed, was accomplished after plaintiff had ceased to be a paying passenger. The determination of this issue in the affirmative produces two conclusions. The first is that if plaintiff was not a passenger for hire at the time the assault was committed, the driver's employer owed no protection and the insurer could not be required to respond in damages, and, secondly, if the passenger relationship had terminated any unlawful act of the taxicab driver would be beyond the course and scope of his authority.
In Williams v. Shreveport Yellow Cab Company, Inc., La.App., 1938, 183 So. 120-124, this court declared that when the deceased ceased to be a passenger for hire there was no contractual relation between him and the defendant cab company and there was no liability on the part of the cab company for damages arising thereafter. This principle undoubtedly is derived from Article 2320 of the LSA-Civil Code wherein it is provided that masters or employers are answerable for the damage occasioned by their servants in the exercise of the functions in which they are employed. Thus, it is inconceivable that the master would be liable for the faults of the servant except where the wrong arises during the service of the employee on behalf of the master.
In the Williams case, supra, the court actually found that the deceased had never intended to pay the cab fare; that he occupied the position of a trespasser and for this reason the cab company owed no duty of safety to the deceased, and also it was held that any unlawful act of the employee towards an occupant of the cab in the absence of a passenger for hire relation was beyond the scope and course of the employee's authority and excused the master from liability.
In the instant case, if we accept plaintiff's testimony, as indeed we feel we are bound to do, it is clear that plaintiff had definitely decided to terminate his contract for carriage. He had decided to leave the cab in order to seek other transportation and had opened the door and left the cab. This, in our opinion, constituted the end of his journey as a passenger for hire, and the carrier at this point ceased to be responsible for his safety. The contract of transportation was terminated. It is true that Barringer says Sims was endeavoring to get him to return to the cab but there is no evidence that Barringer had acceded to the invitation of Sims. It was only after Barringer suffered his injury and was in a more or less unconscious condition that he was put back into the cab and carried by Sims to the hotel. Certainly this portion of the journey was made with Barringer's knowledge or consent.
The test as to when a passenger for hire status ends, we think, depends upon the circumstances of each individual case. It is frequently held that if the passenger has not been entirely discharged as such, as for instance where baggage has not been delivered, the contract of carriage is not complete and the master's duty of care still remains. See Shankle v. Tri-State Transit Company of Louisiana, Inc., La.App., 1942, 8 So.2d 714-717. Another reason for liability of the carrier occurs where the difficulty resulting in injury arose during the course of the journey. Shankle v. Tri-State Transit Company of Louisiana, Inc., supra. In the instant case appellant readily admits that the controversy with Sims did not start until he had definitely quit the taxi and that the assault was provoked because Sims wished him to re-enter the cab.
These reasons, we think, as well as the evidence, abundantly support the ruling of the trial judge to the effect that at the time of the alleged assault, plaintiff was no longer a passenger for hire. There was, therefore, no duty of care due him by the employer of the taxicab driver. It also follows that if plaintiff was assaulted by the cab driver after the contractual relationship between plaintiff and the defendant's insured had ceased, the driver was acting beyond the course and scope of his authority in not performing any function for which he was employed.
*177 We find it unnecessary to discuss the other defenses raised by the insurer, other than to say that we are in accord with our brother below in his reasoning that the policy of insurance in the instant case covered and affected any assault and battery committed by an employee of the insured acting within the scope of his authority. Defendant contends that though the policy expressly provides "assault and battery shall be deemed an accident unless committed by or at the direction of the insured" the definition of "insured" contained in the policy includes the operator of the vehicle, namely an employee, such as Sims in this instance, with the result the operator as well as the insured comes within the exclusion. We reason as did the judge a quo that the clause is in the nature of an omnibus clause, however, we think that the limitation "unless committed by or at the direction of the insured" refers only to the named insured. To otherwise hold would be to render this clause completely ineffective, an end surely not intended by the parties thereto.
For the reasons previously assigned, we find no error in the judgment appealed from and, accordingly, it is affirmed at appellant's cost.